

**FILED**

AUG 12 2014

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| In re | CV 13-25-BU-DLC |
| EDRA D. BLIXSETH, | |
| Debtor. | ORDER |
| RICHARD J. SAMSON, | |
| Plaintiff and Appellee, | |
| vs. | |
| WESTERN CAPITAL PARTNERS LLC, | |
| Defendant and Appellant. | |

Appellant Western Capital Partners, LLC, ("WCP") appeals the judgment

entered against it by the United States Bankruptcy Court for the District of

Montana[1] in favor of Richard J. Samson ("the Trustee"), trustee for the Chapter 7

estate of Edra D. Blixseth ("Edra"). The Trustee brings this action to set aside

Edra's personal guaranty in June of 2007 for a $13,065,000 loan ("Loan")

provided by WCP to entities owned by Edra's son, Matthew Crocker ("Crocker"),

---

[1] The Hon. Ralph B. Kirscher, Chief Judge for the United States Bankruptcy Court,
District of Montana, presided over this proceeding.

1

as a constructively fraudulent transfer under 11 U.S.C. § 548(a). The Trustee

contends the guaranty was constructively fraudulent because Edra: (1) was

insolvent on a balance sheet basis; (2) was unable to pay her bills as they came

due; and (3) lacked adequate capital for the business in which she was engaged.

Judge Kirscher determined that the guaranty was constructively fraudulent and

entered judgment in favor of the Trustee. This appeal followed. This Court has

jurisdiction over this appeal under 28 U.S.C. § 158(a)(1). For the reasons stated

below, this Court affirms Judge Kirscher's ruling.

## I. Factual Background[2]

WCP provides "bridge loans" to entities in exchange for real property

collateral and Uniform Commercial Code security interests. In June of 2007,

WCP loaned $13,065,000 ("the Loan") to entities owned by Crocker. The purpose

of the Loan was to provide financing and working capital for a real estate

development project backed by Crocker located in Bozeman, Montana, known as

the "Story Mill Project." Edra provided a personal guaranty for the Loan.

Months prior, in December of 2006, Edra had separated from her husband,

Timothy L. Blixseth ("Tim"), and filed a petition for dissolution of their marriage

---

[2] Judge Kirscher provided a thorough factual background of this case in his Memorandum of Decision. (Doc. 1-6.) As such, this Court will only repeat the facts necessary to understand its decision.

in the Superior Court of California. California is a community property state and, according to Edra, an automatic restraining order was established preventing her from transferring or encumbering any of the community property assets. Tim was eventually appointed manager of the community property and prevented Edra from having any control over the property, leaving her with no access to cash flow. As a result, Edra refused, or was unable, to provide WCP with the vast majority of her financial statements and documents. Instead, she provided WCP with a letter from her attorney describing her general financial information.

In this letter, Edra's attorney described Edra and Tim's community property as collectively worth "in excess of $1 billion dollars" and, following the divorce, Edra would likely "receive assets with a value in excess of $500 million dollars." (Doc. 20-31 at 90.) Additionally, Edra's attorney stated that Edra would also likely receive a property known as "Porcupine Creek," worth in excess of $200 million. Edra told WCP that she owned Porcupine Creek free of any encumbrances, and, if need be, was willing to use the property as collateral to take out a loan to pay WCP. In fact, though the property was free of encumbrances, Edra did not own it. Blixseth Group, Inc., a Oregon sub-S corporation solely owned by Tim, owned Porcupine Creek. In any event, Edra's attorney concluded

3

in his letter to WCP's counsel that "I do not believe that the group should have any concerns in making the loan to Mrs. Blixseth." *Id.*

WCP also obtained a loan affidavit signed by Edra and Crocker asserting that "none of the Borrowers, nor Guarantors are: (i) currently insolvent on a balance sheet basis: or (ii) currently unable to pay their debts as they come due." (Doc. 20-30 at 144.) Edra and Crocker also asserted that they did not have delinquent tax obligations.

The Loan closed on June 15, 2007, for the total amount of $13,065,000 and an interest rate of 11 percent. The Loan was also supported by a promissory note, with a maturity date of June 14, 2009. The default interest rate of this note was 15 percent per annum, compounded monthly. In addition to the affidavit and note, WCP required further reassurances that the Loan would be repaid. These reassurances included: (1) personal guarantees on the Loan from Edra and Crocker; and (2) security interests in multiple properties. Unbeknownst to Edra, when she signed the Loan documents she also gave WCP a security interest on all her personal assets. At trial, Edra testified that she would have never signed the security interest if she had known that it was a condition for the Loan.

One property pledged as a security interest was Lot 176. Lot 176 is a

property located at the Yellowstone Club[3] and was owned by Monarch GoBuild Construction, LLC ("Monarch GoBuild"), a construction company formed by Edra and Crocker. At the request of WCP, Monarch GoBuild transferred Lot 176 to Montana Specs, LLC ("Montana Specs"), a single purpose entity. At closing, Crocker held 100% ownership interest in Montana Specs.

After closing the Loan, Crocker's hopes that the Loan would solve his financial problems were short lived. Proceeds from the Loan went to paying off debts incurred by Crocker and his various businesses, including paying off the amount owed on Lot 176 and taxes owed on various properties. Nonetheless, Crocker and his businesses were in financial trouble. Eventually, Crocker defaulted on the Loan in September of 2008. Prior to this default, Edra made payments in excess of $4.5 million to WCP between May 30, 2007, and September 9, 2008.

In early 2007, Edra and Tim were in the process of finalizing their divorce. In May of 2007, the Superior Court of California held a hearing where the couple agreed to a division of the marriage's community property. Following this hearing, the court entered an order which became known as "Mini Settlement

---

[3] The Yellowstone Club is "a members only master-planned unit development, situated on 13,500 acres of private land in Madison County near Big Sky, Montana." (Doc. 1-6 at 7.) Known to be the only private ski resort in the world, the Yellowstone Club caters to the extremely wealthy.

One." This settlement stipulated that Edra would receive various properties from the community property, including Casa Captiva, a property located in Mexico, and a Yellowstone Club property known as Lot 48. Tim and Edra signed this agreement in August of 2007.

In March of 2009, Edra filed a voluntary Chapter 11 bankruptcy petition. Shortly thereafter, this bankruptcy proceeding was converted to Chapter 7 of the Bankruptcy Code and Samson was appointed as the trustee. On August 7, 2009, WCP filed a proof of claim asserting a $13,965,144.17 secured claim against Edra, with an annual interest rate of 15 percent. In response, the Trustee argued: (1) Edra's guarantee of the Loan was a fraudulent transfer under Montana and federal law and is thus avoidable; (2) WCP received a preferential transfer when it garnished Edra's checking account; (3) WCP charged an usurious rate of interest; and (4) WCP's proof of claim should be disallowed. In a four day bench trial in June 2012, in Missoula, Montana, Judge Kirscher heard testimony from multiple fact and expert witnesses, admitted multiple exhibits, and ultimately ruled in favor of the Trustee.

The issue of Edra's insolvency was a key issue during the trial, as it is a required element in proving a fraudulent transfer claim. At trial, solvency experts for both the Trustee and WCP provided opinions on Edra's insolvency. Both

experts agreed that solvency can be determined by applying one of three tests: (1) the Balance Sheet Test; (2) the Adequate Capital Test; or (3) the Cash Flow Test. Failure of any one of the three tests would establish Edra's insolvency. Edra's expert, Joseph N. Karas ("Karas"), testified that Edra was insolvent under all three tests. In contrast, WCP's expert witness, Kristina A. Cook ("Cook"), testified that Edra was solvent under all three tests. Judge Kirscher found Karas's testimony persuasive and determined that Edra was insolvent under all three tests.

After finding that Edra was insolvent under all three tests, Judge Kirscher set aside Edra's guaranty of the Loan and awarded the Trustee $4,013,410.99 in damages, which included: (1) money WCP received after liquidating Edra's personal and real property; (2) funds garnished by WCP from Edra's bank account; (3) interest payments made by Edra towards the guaranty obligation; and (4) Edra's interest in various contract claims. Judge Kirscher also determined that WCP charged an interest rate of 16.034%, which the court found to be usurious under Montana law and awarded $336,609.99 in damages for the interest payments made by Edra.

## II. Standard

When considering an appeal from a bankruptcy court, a district court applies the same standard of a review a circuit court would use in reviewing a decision of

a district court. *See Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir. 1997). A district court reviews a bankruptcy court's legal conclusions de novo and factual findings for clear error. *In re Leavitt*, 171 F.3d 1219, 1222 (9th Cir. 1999) (citations omitted). Mixed questions of fact and law are reviewed de novo. *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004).

## III. Discussion

WCP raises four issues on appeal and argues Judge Kirscher erred by: (1) entering a final judgment when WCP did not consent to the bankruptcy court's authority; (2) finding that Edra was insolvent; (3) awarding remedies; and (4) finding that WCP charged an usurious interest rate.

### A. Jurisdiction of the Bankruptcy Court

#### 1. Consent

WCP contends it did not consent to Judge Kirscher entering a final judgment and, therefore, the court lacked the constitutional authority to enter a final judgment. Judge Kirscher explicitly determined that WCP consented to his jurisdiction at trial, as confirmed by counsel for Samson. Upon review of the record, it appears the trial transcript begins several minutes into the proceeding and does not reveal if WCP consented, which apparently occurred before the recording began. However, WCP steadfastly maintains it did not consent. Thus,

8

this Court will presume that WCP withheld its consent, although it is hesitant to question the recollection of both Judge Kirscher and Samson's counsel.

## 2. Constitutional Authority of the Bankruptcy Court

Until relatively recently, the Ninth Circuit Court of Appeals has consistently held that bankruptcy judges have the statutory authority to issue final judgments on fraudulent transfer claims. *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558 (9th Cir. 2012). This was due to the Bankruptcy Code designating fraudulent conveyances actions as "core proceedings." 28 U.S.C. § 157(b)(2)(H). Under the Code, if a referred matter is designated a "core proceeding" then bankruptcy judges have the power to adjudicate the controversy and issue a final ruling. *Id.* at § 157(b)(1); *Bellingham*, 702 F.3d at 558. If a proceeding is not deemed a "core proceeding" bankruptcy judges must submit proposed findings of fact and conclusions of law to an Article III judge for approval. 28 U.S.C. § 157(c)(1); *Bellingham*, 702 F.3d at 558. However, following the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the constitutional authority of bankruptcy judges to issue final rulings on certain types of core proceedings has been called into question.

In *Stern*, the Court took up the issue of whether an Article I judge possessed the constitutional authority to issue a final ruling on a common law cause of

action, specifically a counterclaim for tortious interference. *Stern*, 131 S. Ct. at 2600. The Court explained in *Stern* that bankruptcy judges lack the constitutional authority to issue final rulings in cases that deal with "private rights" created under state law. *Id.* at 2620. These rights are distinguished from "public rights" which can be constitutionally heard and decided by Article I courts. *Id.* at 2610. Ultimately, the *Stern* Court concluded the bankruptcy judge there lacked the constitutional authority to rule on the tortious interference counterclaim because the claim would not be "resolved in the process of ruling on [the] creditor's proof of claim." *Id.* at 2620. However, the *Stern* Court described many cases and situations that involve private rights, but for various reasons, fall under the public rights exception. *Id.* at 2616–2618. Picking up on this discussion, the Sixth Circuit Court of Appeals has held that one exception involves situations where "it [is] not possible . . . to rule on [the creditor's] proof of claim without first resolving the fraudulent-transfer issue." *In re Global Technovations Inc.*, 694 F.3d 705, 722 (6th Cir. 2012) (quoting *Stern*, 131 S.Ct. at 2616) (citations and internal quote marks removed).

This case fits within the exception set forth in *Stern* and *In re Global*. Here, Judge Kirscher had the constitutional authority to make a final ruling on the Trustee's fraudulent transfer claim because it was not possible to rule on WCP's

proof of claim without first resolving the fraudulent transfer issue. Additionally, the Trustee's claim stems from the bankruptcy proceeding and could not be litigated outside it.

WCP argues that Judge Kirscher was prevented from issuing a final ruling because of the Ninth Circuit's holding in *Bellingham*. This Court disagrees. In *Bellingham*, the Court held the bankruptcy judge could not issue a final ruling on a fraudulent conveyance action because the case concerned a non-creditor who was involuntarily brought into the bankruptcy proceeding. Thus, the Court's holding in *Bellingham* was limited to non-creditors who did not file a proof of claim against the bankruptcy estate. *Id.* at 572. Here, by contrast, WCP is a creditor who voluntarily injected itself into the realm of the bankruptcy court by filing a proof of claim. *In re Global Technovations Inc.*, 694 F.3d 705, 722 (6th Cir. 2012).

The Court finds the case at bar more closely resembles the Sixth Circuit's decision in *Global Technovations*, where it found that a bankruptcy judge may issue a final ruling in a fraudulent transfer action because the party in question voluntarily brought itself under the authority of the court by filing a proof of claim against the bankruptcy estate. *Global Technovations*, 694 F.3d at 722. Indeed, *Bellingham* distinguishes the cases on this ground:

> Our analysis is unaffected by the Sixth Circuit's recent decision in . . . *Global Technovations*. There, the Sixth Circuit concluded that it was crystal clear that the bankruptcy court had constitutional jurisdiction under *Stern* to adjudicate whether the [transfer] was a fraudulent transfer. . . . [This] rendered *Global [Technovations]* fundamentally unlike . . . our case, where the bankruptcy estate reached out to file a fraudulent-transfer claim against a party who had filed no claim against the estate.

*Bellingham*, 702 F.3d at 562 n.7 (citations and internal quote marks omitted).

Because this case involves a creditor who filed a proof of claim, and this claim could not be resolved without first ruling on the fraudulent transfer issue, Judge Kirscher had the constitutional authority to issue a final ruling.

However, if this proceeding is determined to be outside the constitutional limits of Judge Kirscher's authority, in the alternative, this Court will treat Judge Kirscher's memorandum of decision as proposed findings of fact and conclusions of law. As stated above, this Court agrees with Judge Kirscher's opinion and would adopt his findings of fact and conclusions of law in their entirety.

## B. Solvency

WCP argues that Edra was "overwhelmingly solvent" and Judge Kirscher improperly relied on Karas's application of the solvency tests. (Doc. 19 at 30.)[4]

---

[4] Notably, WCP originally filed an adversary proceeding against Edra under 11 U.S.C. 523(a)(2)(B) seeking to except Edra's debt from discharge. Moving for summary judgment on the claim, WCP argued that Edra was insolvent and unable to pay her debts as they came due. However, five days after the Trustee commenced this proceeding, WCP agreed to dismiss its adversary proceeding in order to defend against the fraudulent transfer claim.

For the reasons explained below, the Court disagrees.

An obligation is constructively fraudulent, and can thus be avoided under 11 U.S.C. § 548(a)(1)(B), if four elements are established by the Trustee: (1) Edra incurred an obligation; (2) this obligation was incurred within two years of the bankruptcy petition date; and (3) Edra received less than reasonable value in exchange for the obligation. The fourth element can be established in one of three ways:

> (ii)(I) [the debtor] was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) [the debtor] was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
>
> (III) [the debtor] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. § 548(a)(1)(B).

The fourth element is disputed by WCP and presents the main issue before the Court.

### 1. Balance Sheet Test

WCP argues that Judge Kirscher erred by adopting Karas's opinion that Edra was insolvent under the Balance Sheet Test. WCP contends that Karas

erroneously defined assets to include only: (1) assets that Edra controlled and could liquidate to pay her creditors; and (2) assets that produced cash flow. WCP contends that a proper solvency analysis should also include Edra's interest in the community property tied-up in the California dissolution proceeding, regardless if she could liquidate it for the benefit of her creditors. This Court disagrees.

Insolvency, under the Bankruptcy Code, is defined as a "financial condition such that the sum of such [debtor]'s debts is greater than all of such [debtor]'s property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). "This definition of insolvency is the traditional bankruptcy balance sheet test of insolvency: whether debts are greater than assets, at a fair evaluation, exclusive of exempted property." *In re Koubourlis*, 869 F.2d 1319, 1321 (9th Cir. 1989) (citation omitted). Thus, when conducting the Balance Sheet Test, a court must assign a value to a debtor's assets and liabilities and then determine whether the value of the assets exceeds the value of the debtor's liabilities. *In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr. W.D. La. 2001). Further, "[b]ecause [a] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time, asset valuation . . . should be reduced by the value of the assets not readily susceptible to liquidation and payments of debts." *Id.* at 370 (citations and internal quote marks omitted). While federal law controls for determining whether

the transfer occurred, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. U.S.*, 440 U.S. 48, 54–55 (1979).

Applying this framework, Karas properly excluded the community property in his analysis because Edra did not control it. Karas stated that control of an asset is generally "not a factor under the general balance sheet concept, but . . . control is a critical factor when looking at solvency because all three solvency tests come back to what an asset can generate in terms of cash on a forward looking basis." (Doc. 1-6 at 56.) According to Karas, when determining solvency, a person's present and future cash flows "are the most important determination as to your ability to repay debts and to meet scheduled obligations . . . ." (Doc. 1-6 at 56.) Therefore, because Tim had control over the community property and Edra could not convert those assets to cash, Karas did not include those assets in his analysis. The Court agrees with Karas that, under the facts of this case, this is the best approach to determine if Edra was insolvent on June 15, 2007.[5]

---

[5] This is the day Edra signed the guaranty and is the appropriate date for determining Edra's solvency under the Balance Sheet Test. 11 U.S.C. § 548(a)(1)(B)(ii)(I).

WCP argues that this Court should apply a broad definition of "assets" when determining Edra's solvency. Instead of adopting Karas's GAAP[6] "cash flow centric definition," WCP contends that this Court should define an asset as property that "was subject to a levy, execution or other legal process against an uncooperative debtor." (Doc. 19 at 28–29.) Thus, according to WCP, Edra's theoretical fifty percent interest in the community property should be considered an asset because under California law, Edra's "creditors had the ability to impose a lien on all the community property that would ultimately be awarded to Edra as well as the property that had been transmuted to her in the First Mini-Settlement." (Doc. 19 at 33.)

First, Edra was separated from her husband in June of 2007. California law provides that community property cannot be used to pay post-separation debts. Cal. Fam. Code §§ 910, 916. Thus, Edra's creditors could not debit, seize, or encumber the community property to repay her personal debts. In fact, WCP employees testified that they were unable to place liens on community property that would be eventually awarded to Edra following the First Mini Settlement because she did not own this property when she executed the guaranty.

---

[6] "GAAP" means generally accepted accounting principles and are the "conventions, rules, and procedures that define approved accounting practices at a particular time." *Black's Law Dictionary* 753 (Bryan A. Garner ed., 9th ed., West 2009).

Second, WCP's argument ignores the reality of the situation: Edra was insolvent in June of 2007 because she could not access or liquidate the community property to pay her creditors. Though Edra had a theoretical fifty percent interest in the community property, she did not own or control it in June of 2007. This property was under the sole control of Tim and he prevented the property from being encumbered or sold without his permission. This Court agrees with Judge Kirscher that "[Edra] could not use the community property for operations, as collateral for borrowing, or for equity financing." (Doc. 1-6 at 57.) Edra's lack of control over the community property is crucial to an understanding of her solvency in June of 2007.

WCP cites to *In re 3dfx Interactive, Inc.*, 389 B.R. 842 (Bankr. N.D. Cal. 2008), for its argument that a GAAP focused analysis is erroneous when defining "asset" for solvency purposes. WCP contends that *3dfx Interactive* stands for the legal principle that the appropriate definition of an asset is "property of the debtor that is subject to involuntary legal process by a creditor." (Doc. 23 at 9.) WCP misconstrues *3dfx Interactive*'s holding. While the court in *3dfx Interactive* disregarded an expert's GAAP focused opinion as to the correct value of a business, the court did not hold a GAAP focused approach is always inappropriate when assessing solvency. Instead, the court found that, under the facts of the case,

a non-GAAP focused approach was more appropriate in answering the question before the court. If anything, *3dfx Interactive* highlights the important function of the fact-finder in weighing the credibility of an expert's opinion. *Id.* at 867. Thus, WCP is incorrect that it is legal error to apply a GAAP focused method for determining what constitutes an asset for purposes of a solvency analysis.

WCP also argues that neither Karas nor Judge Kirsher questioned the value of the community property and therefore it is undisputed that Cook's valuation of the community property is correct. First, the value of the community property is ultimately irrelevant because Edra had no control or right to the property in June of 2007. Second, this is not an accurate statement of Judge Kirscher's opinion. Though Judge Kirscher did not directly question the appraised value of the community property, he was highly skeptical of the manner in which Cook assigned values to these properties. For example: (1) Cook placed little emphasis on whether a property generated income or whether it required money to operate and maintain; and (2) she did not apply professional skepticism or question the values assigned to the community property. Considering that many, if not all, of these properties required very significant sums of money to operate and maintain,

this goes directly to the reasonableness of Cook's solvency analysis.[7]

Additionally, Cook included property awarded to Edra in the First Mini Settlement in her solvency analysis, but did not question the value assigned to this property or consider Edra's lack of control over it. This is significant because many of these properties remained under the control of Tim, which prevented Edra from liquidating these properties until the finalization of their marriage settlement agreement in 2008. For example, Lot 48 was awarded to Edra under the First Mini Settlement, but she could not sell or borrow against the property until it was conveyed to her in 2008. Additionally, Casa Captiva was never actually part of Edra's bankruptcy estate because the property remained the property of Blixseth Group, Inc., a company controlled entirely by Tim.

Like Judge Kirscher, this Court finds Karas's opinion persuasive as to Edra's insolvency in June of 2007. Unlike Cook, Karas looked at the reality of the situation and accounted for factors that Cook did not. Karas's methodology in forming his opinion was reasonable. Ultimately, Karas's opinion was more credible than Cook's. In June of 2007, Edra was insolvent under the Balance Sheet Test.

---

[7] For instance, Tim Blixseth testified that the expenses associated with Porcupine Creek, alone, exceeded $500,000 per month.

## 2. Adequate Capital Test

Even though this Court find's Edra insolvent under the Balance Sheet Test, which satisfies the fourth element of § 548(a)(1)(B), this Court also finds that the Trustee has met his burden under the Adequate Capital Test. As stated above, the Adequate Capital Test is satisfied by showing that Edra "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital[.]" § 548(a)(1)(B)(ii)(II).

WCP contends that this test requires "a causal link between WCP's loan and Edra's ultimate financial ruin [and] the Court was required to make a specific finding that WCP's loan left Edra with inadequate capital." (Doc. 19 at 38.) Because Judge Kirscher did not make a finding that the Loan caused Edra's bankruptcy, WCP contends this is grounds for reversal. WCP cites to *In re Pioneer Home Builders, Inc.*, 147 B.R. 889 (Bankr. W.D. Tex. 1992), among others, for its argument.

This Court is not persuaded by WCP's causal link argument. Though *In re Pioneer Home Builders, Inc.*, did require a causal element in its Adequate Capital Test, the court did not cite to any law beyond the plain language of the statute. *In re Pioneer Home Builders, Inc.*, 147 B.R. at 894. This Court does not read a

causation element in § 548(a)(1)(B)(ii)(II). Instead, the Court reads the statute as requiring a showing that, at the time the transaction took place, Edra had unreasonably small capital.

This Court is persuaded by Karas's opinion that "a solvency analysis should always start by looking at an entity's operating or future cash flows in order to ascertain the supportable level of debt." (Doc. 1-6 at 62.) As one court stated, "unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually." *In re O'Day Corp.*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) (citation omitted). Edra was spending upwards of two million dollars per month maintaining her properties. She was also borrowing massive amounts of money to pay her creditors, but was not generating capital through business operations. In other words, Edra was borrowing money to pay for earlier borrowed money, frequently at increased interest rates, slowly but surely digging an ever-deepening financial hole. The only way Edra could create positive cash flow was the sale of assets. This lack of a positive cash flow, coupled with Edra's growing liabilities, resulted in unreasonably small capital.

WCP contends that Edra was "solvent under Adequate Capital Test because [Edra] still had the ability to borrow money with which to fund her day-to-day

operations." (Doc. 1-6 at 60.) However, this Court finds that the ability to borrow additional cash is not an adequate alternative to the production of a positive cash flow. Instead, the Court agrees with the Trustee and finds that taking on additional debt to replace one creditor with another, is not a substitute for adequate capital. In June of 2007, Edra did not have adequate capital to maintain her cash flows.

### 3. Cash Flow Test

As stated above, even though this Court has found that Trustee has met his burden under either § 548(a)(1)(B)(ii)(I) or § 548(a)(1)(B)(ii)(II), the Court additionally finds that the Trustee has met his burden under § 548(a)(1)(B)(ii)(III), i.e., the Cash Flow Test. This section states that the fourth element of a constructively fraudulent claim is met if the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]" § 548(a)(1)(B)(ii)(III). As described by Karas, "this test examines whether an entity has the ability to pay going forward, and it's probably the dominant test that people use to determine solvency." (Doc. 1-6 at 37.)

WCP argues that this test is purely subjective and required a finding that Edra "had the actual intent to not repay her debts." (Doc. 19 at 41.) However, this Court agrees with Karas that, in June 2007, "[D]ebtor could not have reasonably

believed that [she] would be able to repay her debts as they matured." *WRT Energy*, 282 B.R. at 415. Courts have found that the intent requirement of a fraudulent conveyance statute can be inferred through objective means. *See id.* Here, due to Edra's limited ability to generate capital, and the fact that any assets Edra did control required large amounts of money to operate and maintain, she could not reasonably believe that she could pay her debts as they matured. Also, Edra's intent to pay her debts is also not as clear as WCP argues. Edra stated that in June of 2007 she struggled to pay her bills and described this period of time as "trying to pay [for] $100 worth of stuff with 10 cents." (Doc. 1-6 at 25.) This statement goes directly to the reasonableness of whether Edra actually believed that she could pay her bills as they came due.

WCP contends that *WRT Energy* stands for the principle that objective means can only be utilized by a court in a fraudulent transfer analysis if there is an absence of subjective intent. Not so. The court in *WRT Energy* looked at the facts and circumstances surrounding the transaction to infer the debtor's intent, even after making a finding that the debtor held a subjective belief that it would pay its debts. *Id.* WCP's argument ignores the analysis performed by the court in *WRT Energy*. Thus, this Court considers both Edra's subjective intent and whether Edra could have reasonably believed she could pay her debts as they matured. As stated

above, considering Edra's financial situation in June of 2007, Edra could not have reasonably believed that she would be able to repay her debts.

### 4. Taxes

WCP also appeals Judge Kirscher taking judicial notice of Edra's outstanding tax liabilities, which number in excess of $75 million. Because this Court agrees with Judge Kirscher that Edra was insolvent before the addition of Edra's tax liabilities, this Court declines to take up WCP's arguments. Edra was insolvent in June of 2007, with or without the addition of her tax liabilities.

## C. Damages

### 1. Remedies under Section 550

Next, WCP challenges the award of damages to the Trustee. WCP contends that the Trustee was required to put on evidence of the value of WCP's security interest and, according to WCP, the Trustee failed to do so. WCP maintains that because the Trustee did not provide evidence of the value of WCP's security interest, Judge Kirscher could not award the remedies he did under Section 550. WCP cites to *In re Taylor*, 599 F.3d 880 (9th Cir. 2010), in support of its argument. WCP's argument is without merit.

Section 550 of the Bankruptcy Code provides that:

"[T]o the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made; or . . . any immediate or mediate transferee . . . ."

11 U.S.C. § 550(a)(1).

If the transferred property is a security interest, bankruptcy courts retain the discretion under § 550 to either "award the trustee recovery of the property transferred or the value of the property transferred." *In re Taylor*, 599 F.3d 880, 890 (9th Cir. 2010). This reflects the goal of § 550, which is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Id.* Generally, the value of the property is determined by the market value of the property at the time of the transfer. However, the Ninth Circuit has found that bankruptcy courts enjoy discretion in valuing property, "so as to put the estate back to its pretransfer position." *Id.* (citation omitted). Additionally, under § 550 trustees have the discretion to pursue recovery of a fraudulent transfer, in lieu of simply seeking the cancellation of the transfer. *Id.*

Here, the Trustee requested that every transfer made for the benefit of WCP be avoided, including the guaranty, the security agreement, and Edra's "voluntary and involuntary transfers of property to WCP in connection with those

documents." (Doc. 21 at 44.) Judge Kirscher did not abuse his discretion in determining that the appropriate remedy for returning the bankruptcy estate to its pre-transfer financial condition was to award to the Trustee the money WCP received from the sale of Edra's assets.

Next, this Court is not persuaded by WCP's argument that *In re Taylor* prevents Judge Kirscher from equating the money WCP received from the sale of Edra's assets to the value of the transfer. *In re Taylor* dealt with a situation where a bank had a security interest in a vehicle, but did not actually foreclose on that security interest. There, it was necessary for the bankruptcy court to determine the value of the security interest at the time of the transfer because the record lacked evidence of the market value of the security interest at the time of the judgment. *Taylor*, 599 F.3d at 891. Here, because WCP actually foreclosed on Edra's assets, there was evidence of the value of WCP's security interest at the time of the judgment (i.e., the money WCP received from the sale of Edra's assets). Therefore, it was not necessary for Judge Kirscher to determine the value of the WCP's security interest at the time of the transfer. Judge Kirscher did not abuse his discretion.

Finally, because the Court finds that Judge Kirscher did not abuse his discretion in awarding remedies under § 550, the Court finds that WCP's

arguments based on § 551 and § 362(h) are moot.

### 2. Lot 176

WCP also challenges the inclusion of Lot 176 in Judge Kirscher's award of damages. WCP maintains that because Edra never directly owned Lot 176 when Monarch GoBuild transferred it to Montana Specs at closing, Edra never had an actual interest in the property and could not seek its avoidance under § 548(a)(1). However, the Court agrees with Judge Kirscher that, in this situation, it "is appropriate to dispense with the structure of the transactions and evaluate the net impact on [Edra]." (Doc. 1-6 at 64.)

The Bankruptcy Code provides that if a transfer is avoided under § 548 the trustee may recover the property or the value of the property from "the entity for whose benefit the transfer was made . . . ." 11 U.S.C. § 550(a)(1). Here, Lot 176 was transferred from Monarch GoBuild to Montana Specs purely to benefit WCP. Edra had a 45% ownership interest in Lot 176 before the Loan, valued at $1,258,949.27. After the Loan, Edra had no ownership interest in Lot 176. In fact, Lot 176 was transferred to Montana Specs at the request of WCP. Judge Kirscher's reasoning is sound.

**D. Usury**

WCP also argues that Judge Kirscher erred by finding that WCP waived its claim preclusion defense. WCP maintains that it raised this argument in its final pretrial order and this "was all WCP was required to do." (Doc. 19 at 49.) WCP is mistaken.

The Federal Rules of Civil Procedure require that an affirmative defense must be pleaded in the initial pleadings to avoid waiver of that defense. Fed. R. Civ. P. 8(c); *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 735 (9th Cir. 1988). Here, WCP did not raise the defense of claim preclusion until its final pretrial order. WCP has waived its defense of claim preclusion. WCP's arguments pertaining to claim preclusion are deemed moot by the Court and will not be addressed.

Next, WCP asserts that Judge Kirscher improperly calculated the total interest owed on the Loan by omitting 80 days from his calculation, purportedly in violation of Montana's spreading doctrine. However, Judge Kirscher's calculations were derived purely from WCP's own calculations, which "accrue[d] interest to March 29, 2009, but spread[] the interest calculation out to June 14, 2009." (Doc. 1-6 at 78.) Judge Kirscher found it appropriate to subtract the 80 days from his calculation because this reflected the actual time frame in which

WCP based its interest calculation. This Court agrees with Judge Kirscher that, applying WCP's own interest calculation, WCP charged an usurious interest rate.

Finally, WCP contends that Edra did not directly pay interest on the Loan and, therefore, cannot assert a claim for usury. Contrary to WCP assertions, the evidence in the record is clear that Edra paid interest on the Loan. Edra testified that she was the source of at least $311,409.06 in interest payments. In addition to these payments, the evidence reflected that Edra was the probable source of at least $1,438,596.72 in interest payments. WCP's argument that these were actually loans to Story Mill, and not payments by Edra, is without merit.

**IV. Conclusion**

Upon a de novo review of the Bankruptcy Court's legal conclusions, the Court determines the Bankruptcy Court's order awarding judgment against Appellant Western Capital Partners, LLC, in favor of Appellee Richard J. Samson was based on legal grounds within the contemplation of the Bankruptcy Code and on factual findings that are not clearly erroneous.

IT IS ORDERED that the Bankruptcy Court's order awarding judgment in favor of Richard J. Samson, and against Western Capital Partners, LLC, for the sum of $4,013,410.99 and the return of all property transferred on August 24, 2010, is AFFIRMED.

IT IS FURTHER ORDERED that the Bankruptcy Court's judgment in favor of Richard J. Samson, and against Western Capital Partners, LLC, for the award of $356,609.69 on the claim of usury is AFFIRMED.

IT IS FURTHER ORDERED that the Bankruptcy Court's judgment is AFFIRMED in all other respects.

DATED this 12th day of August, 2014.

Dana L. Christensen, Chief Judge
United States District Court